UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
SABRE INDUSTRIES, INC.,

                      Plaintiff,

     -against-

DISH WIRELESS LEASING L.L.C.,

                      Defendant.
--------------------------------------------------------

Civil Action No.:

**COMPLAINT**

Sabre Industries, Inc. (hereinafter "Sabre"), by and through its undersigned counsel, files this Complaint for declaratory judgment and money damages against DISH Wireless Leasing L.L.C. (hereinafter "DISH") and alleges as follows:

## INTRODUCTION

1. This action arises out of a breach of contract by DISH where it failed to fulfill its contractual obligations to purchase telecommunication equipment, for use in DISH's development of a nationwide wireless network, that was agreed to be manufactured and supplied by Sabre.

2. DISH attempted to unlawfully terminate the agreements between the parties because the Federal Communications Commission ("FCC") initiated an investigation into reversing wireless spectrum licenses issued to DISH's parent company, EchoStar Corporation (hereinafter "EchoStar") (formerly known as DISH Network Corporation), and certain of its subsidiaries, which DISH claims is a force majeure event and making performance commercially unpracticable thus excusing DISH from continuing to honor fully executed agreements between the parties, specifically, a Master Purchase Agreement, dated April 10,

1

2024, First Amendment to Master Purchase Agreement, dated February 18, 2025 and a Binding Letter of Commitment, dated May 1, 2025.

3. DISH fails to acknowledge that the Master Purchase Agreement, Section 12.1 specifically excludes all actions by a government authority as being a force majeure event, expressly including the FCC, such as investigations, restrictions or prohibitions on a party or its affiliate.

4. On April 10, 2024, DISH and Sabre executed a long-term Master Purchase Agreement (hereinafter the "MPA") which provided DISH access to Sabre's products and services.

5. On February 18, 2025, DISH and Sabre executed a First Amendment to Master Purchase Agreement (hereinafter "First Amendment to MPA"), which amended certain provisions of the MPA.

6. On May 1, 2025, DISH and Sabre executed a Binding Letter of Commitment (hereinafter the "LOC") reaffirming the parties' respective duties and obligations pursuant to the terms of the MPA and modifying the MPA as to future purchase commitments by DISH as expressly outlined within the LOC.

7. Pursuant to the MPA, First Amendment to MPA, and LOC (collectively "the Agreements"), DISH owes Sabre the outstanding amount of $2,876,810 which is comprised of $768,533 in active Purchase Orders, and $2,108,277 for the total committed purchase value required by the LOC.

8. In an effort to avoid liability to Sabre pursuant to the MPA and LOC, DISH claims that EchoStar entered into deals to sell wireless spectrum licenses resulting in DISH making the decision to abandon its plan for Boost Mobile and that these voluntary decisions constitute

a force majeure event excusing DISH from further performance under the MPA, First Amendment to MPA and LOC and allowing DISH to terminate the MPA, First Amendment to MPA and LOC for convenience and without repercussions. In addition to constituting force majeure, DISH claims that the sale of the spectrum licenses frustrated the purpose of the MPA and LOC and rendered its performance commercially impracticable. DISH further asserts the sale of the wireless spectrum licenses was required as a result of a decision by the FCC to revoke the spectrum licenses if they were not sold.

9. On October 17, 2025, DISH sent a letter to Sabre (the "October 17 Letter"), asserting that these voluntary decisions by DISH and its affiliates constituted a force majeure event under the MPA. DISH also informed Sabre that it was terminating the MPA and LOC for convenience and without repercussions.

10. DISH claimed in the October 17 Letter that its spectrum sales were necessary to avoid revocation of the spectrum licenses by the FCC. However, this representation was false, as the FCC has not issued an order requiring EchoStar to sell any of its spectrum licenses.

11. There have been no unexpected or unforeseen events outside of DISH's control, as its affiliate EchoStar made a voluntary business decision to sell its wireless spectrum licenses. This business decision is the antithesis of a force majeure event as defined in the MPA.

12. Further, the LOC provides that "in the event of any conflict between this LOC and the MPA, the terms of this LOC shall govern with respect to matters addressed herein."

13. The LOC states that "The Parties hereby agree that this LOC is **firm, non-cancelable and legally binding…**"

14. DISH's attempt to cancel the MPA and LOC is wrongful, unauthorized, undertaken in bad faith, and constitutes a breach of contract.

3

15. Accordingly, Sabre seeks money damages and a declaratory judgment that DISH has not been excused from performing its obligations under the MPA, First Amendment to MPA and LOC, that the Agreements remain in full force and effect, and that DISH remains obligated to perform all of its obligations under the Agreements, including payments for all equipment it purchased and committed to purchase in the future from Sabre.

## PARTIES, JURISDICTION, AND VENUE

16. Plaintiff Sabre is a corporation, organized under the laws of Delaware, having its principal place of business in Alvarado, Texas. Sabre is a provider of highly-engineered, mission critical structures and components to the utility and telecom industries. Sabre provides site construction and equipment installation for wireless networks nationwide.

17. Defendant DISH is a Colorado limited liability company with its principal place of business in Englewood, Colorado. DISH provides wireless, voice and data services in the United States. DBS Corporation is DISH's sole member and is a Colorado corporation which maintains its principal place of business in Englewood, Colorado. As a result, DISH is a citizen of Colorado.

18. Neither DBS nor DISH has a principal place of business in the State of New York.

19. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332, as there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

20. This Court has personal jurisdiction over DISH, as both Parties have consented to the *in personam* jurisdiction of the United States District Court for the Southern District of New York.

21. Venue is proper in this Court because the Parties agreed that all disputes, controversies and claims between the parties shall be litigated solely and exclusively before this Court. The Parties have waived any right to dismiss or transfer any action pursuant to Title 28 U.S.C. Sections 1404 or 1406.

## FACTUAL BACKGROUND

### I.  ECHOSTAR'S ENTRY INTO THE MOBILE WIRELESS BUSINESS

22. DISH is a mobile wireless carrier, available to consumers through its Boost Mobile brand.

23. DISH Network Corporation (now EchoStar) entered the wireless market on or about 2019 and sought to build a nationwide, 5G mobile wireless network. In July 2019, EchoStar informed the FCC of its plan to build a 5G network.

24. EchoStar represented to the FCC that they were committed to meeting certain milestones, which included the deployment of a nationwide 5G network by June 14, 2023.

25. EchoStar also informed the FCC that their entry into the wireless market included their anticipated acquisition of Boost Mobile, which was then a part of Sprint. With the use of DISH's spectrum licenses, EchoStar planned to make Boost Mobile the fourth nationwide wireless carrier, with the intent of competing with mainstays Verizon, AT&T, and T-Mobile.

26. EchoStar's acquisition of Boost Mobile closed in July 2020. As a condition of the transaction, the FCC imposed deadlines by when EchoStar would be required to have its mobile wireless coverage reach certain percentages of the U.S. population and/or geography with its 5G broadband services.

27. For example, by June 14, 2022, EchoStar was required to offer 5G broadband services to at least 20% of the U.S. population, and, by June 14, 2023, EchoStar was required to extend 5G service to 70% of the U.S. population.

28. In total, EchoStar spent more than $30 billion to fund their endeavor, which included investments into spectrum and related assets.

## II.  SABRE AND DISH ENTER INTO THE MPA AND LOC

29. DISH's desire to grow Boost Mobile's national presence largely relied upon their ability to deploy their parent company's spectrum assets.

30. To achieve that goal, DISH needed to be able to receive and transmit spectrum frequencies, whilst also permitting mobile devices to access both wireless and data services from across the country. This necessitated the purchase of specific types of equipment and services.

31. Sabre supplies products and materials for the telecommunications industry and was one of the vendors that DISH contracted with, as they were seen as a qualified supplier to develop and supply DISH's required equipment.

### A.  The Master Purchase Agreement and First Amendment

32. On April 10, 2024, Sabre and DISH entered into the MPA, which provided DISH access to products and services necessary for the development of their mobile network. As part of the agreement, Sabre agreed to "(i) manufacture and supply; and (ii) deliver to the Delivery Location all Equipment, Ancillary Equipment and Spare Parts ordered by DISH." A copy of the MPA is attached hereto as **Exhibit A.**

33. The MPA included a force majeure clause. Specifically, Section 12.1 of the MPA explicitly stated that "sanctions, restrictions or prohibitions on activities imposed by any

Governmental Authority on a Party or its Affiliates… or any other action by any Governmental Authority" would **not** be considered a Force Majeure event. The MPA expressly defines "Governmental Authority" to include the FCC.

34. The initial term of the MPA was set to expire on April 10, 2025, but it was extended by one year to April 10, 2026, after the Parties agreed to amend the MPA on February 18, 2025. The First Amendment to the MPA altered provisions involving Payment and Delay of Payment, but the Parties noted that it was not intended to "alter, amend, or modify any other portions of the Agreement." A copy of the First Amendment to the MPA is attached hereto as **Exhibit B**.

### B. The Binding Letter of Commitment

35. On or about May 1, 2025, Sabre and DISH entered into the LOC, which reaffirmed the Parties' obligations under the MPA, as revised in the LOC.

36. The LOC extended the term of the Parties' relationship through December 31, 2027, and required DISH to purchase specific minimum pieces of Equipment.

37. The Parties expressly agreed that the LOC was "firm, non-cancelable and legally binding, issued pursuant to and governed by the terms of the MPA." Furthermore, "[a]ll purchases made under this LOC shall be subject to the terms of the MPA, except to the extent expressly modified herein." The LOC stated that in the event of any conflict between the LOC and the MPA, "the terms of this LOC shall govern with respect to matters addressed herein." A copy of the LOC is attached hereto as **Exhibit C**.

### III. THE SALE OF ECHOSTAR'S SPECTRUM LICENSES

38. DISH claims that its plan to establish a nationwide 5G network did not meet expectations following the execution of the MPA and LOC with Sabre, and DISH claims the

specific license and network utilization commitments that EchoStar made to the FCC could not be accomplished.

39. In Fiscal Year 2023, Dish Network Corporation (now EchoStar) disclosed that it failed to meet certain FCC coverage requirements, which triggered an extension for the company to meet the prerequisites for a considerable share of their available spectrum.

40. Following the 2023 acquisition of DISH by EchoStar, the merged company requested an extension to meet their commitments to the federal government and to become "the competitive fourth facilities-based carrier" in the mobile wireless industry. Ultimately, this extension request was granted by the FCC.

41. In May 2025, the FCC began an inquiry into EchoStar's continued underutilization of their licensed spectrum assets. EchoStar was informed by letter that the FCC intended to review the company's compliance with their federal obligations to provide nationwide 5G service.

42. The likelihood that DISH could be subject to adverse action by the FCC affecting their access to spectrum licenses was foreseeable. DISH undoubtedly knew of this possibility at the time they entered into the MPA and LOC with Sabre. DISH Network Corporation's Form 10-K for 2019, included examples of risk factors, such as the fact that failure "to comply with FCC requirements in a given license area could result in revocation of the license for that license area."

43. EchoStar has previously stated that the FCC did not have any basis to take adverse actions against their spectrum licenses. For example, in an FCC filing made on June 6, 2025, EchoStar stated that any attempt by the FCC to disrupt or otherwise revoke EchoStar's spectrum licenses would be "unlawful, unconstitutional, discriminatory, and utterly baseless."

44. Instead of accelerating their efforts to contest the FCC's ability to take adverse actions against their spectrum licenses, EchoStar affirmatively opted to sell the licenses.

45. On August 26, 2025, EchoStar entered into an agreement with AT&T to sell AT&T certain spectrum licenses for approximately $23 billion (the "AT&T Transaction"). The AT&T Transaction is still subject to regulatory approvals but is expected to close in 2026.

46. Shortly after, EchoStar reached an agreement with SpaceX on September 8, 2025 to sell other spectrum licenses for approximately $17 billion (the "SpaceX Transaction"). Similar to the AT&T Transaction, the SpaceX Transaction is expected to close in 2026, subject to regulatory approvals.

47. On November 6, 2025, EchoStar announced that they had agreed to sell additional spectrum licenses to SpaceX for approximately $2.6 billion. This transaction is also expected to close in 2026, subject to regulatory approvals.

48. EchoStar was never directed by any government regulator to sell their spectrum licenses.

49. In September 2025, EchoStar's chairman Mr. Charles Ergen noted that the spectrum licenses were not sold at a discount, as they were sold at the "market price." This is backed up by public statements made by AT&T executives and reports indicating that AT&T acquired the spectrum licenses for a $7 billion premium. In Mr. Ergen's words, the AT&T and SpaceX Transactions would enable EchoStar to be "cash-rich."

50. After the AT&T and SpaceX Transactions close, DISH plans to transition to become a hybrid Mobile Virtual Network Operator, meaning that instead of providing its own physical network infrastructure like other wireless providers (including Verizon, AT&T, and T-Mobile),

DISH apparently will lease network capacity from those providers, and sell mobile services under its Boost Mobile brand.

## IV. DISH FALSELY ASSERTED FORCE MAJEURE AND COMMERCIAL IMPRACTICABILITY UNDER THE MPA

51. Following the AT&T Transaction and the SpaceX Transaction, DISH developed a scheme to avoid their financial obligations to Sabre and other companies who helped them attempt to build a nationwide wireless network.

52. In furtherance of this scheme, On October 17, 2025, DISH sent the October 17 Letter to Sabre claiming that a force majeure had occurred, and that performance under the MPA was now commercially impracticable. A true and correct copy of this notice is attached as **Exhibit D**.

53. In the October 17 Letter, DISH asserted that EchoStar was required to sell certain spectrum licenses or face license revocation by the FCC. DISH claimed that they were forced to abandon their longstanding business plan for Boost Mobile. DISH claimed that the AT&T and SpaceX Transactions were the result of "unforeseeable actions by the FCC taken outside of DISH Wireless's control." They asserted that this constituted "one or more events of Force Majeure." Furthermore, they claimed that the "unforeseen events" frustrated the purpose of the MPA and made its performance commercially impracticable.

54. Despite DISH's contentions, these circumstances do not constitute force majeure events under the MPA. Specifically, Section 12.1 of the MPA contains a Force Majeure clause that expressly excludes certain events from qualifying as Force Majeure, including "sanctions, restrictions or prohibitions on activities imposed by any Governmental Authority on a Party or its Affiliates… or any other action by any Governmental Authority." Moreover, the MPA

expressly includes the FCC in its definition of Governmental Authority. The circumstances at issue fall squarely within this exclusion.

55. The purported force majeure event claimed by DISH is undermined by its parent company's conduct, public statements and disclosures. In contrast to DISH's claims that EchoStar was forced to sell their spectrum licenses, EchoStar has repeatedly rejected that position.

56. Among other things, the company has told their investors and regulators that any license revocation would be "unlawful, unconstitutional, discriminatory, and utterly baseless," that it did not believe that the FCC could revoke its licenses, that EchoStar had met or exceeded their federal commitments; and that they could win any sort of dispute with the FCC.

57. There is no evidence that the FCC forced or ordered EchoStar to sell their spectrum licenses. The AT&T and SpaceX Transactions were voluntary and intentional business decisions that were made entirely within the control of DISH and their affiliates.

58. Moreover, the circumstances prompting the FCC's inquiry, including DISH's alleged underutilization of its licensed spectrum were anticipated and within the control of DISH and EchoStar to prevent. DISH's SEC filings recognized the risk of license revocation, due to factors entirely within DISH's control. This included the level, quality, and extent of the company's wireless network.

59. Contrary to DISH's assertions, the AT&T and SpaceX Transactions have not rendered performance of the MPA, First Amendment to MPA and LOC commercially impracticable. EchoStar has admitted that it is now "cash-rich." EchoStar has touted the benefits of the transactions, including future opportunities to grow and compete in the marketplace. They have also publicly acknowledged the continued presence of spectrum

licenses in EchoStar's portfolio. In addition, they have touched upon the benefits of Boost Mobile's subscriber base and business model.

60. Recently, DISH paid Sabre $726,778.26 in past due payments under the MPA. These payments undermine DISH's assertion that events occurring between May 2025 and September 2025 now hinder or prevent them from satisfying the current outstanding balance. Although DISH has voluntarily modified its business strategy, it remains more than capable of paying Sabre what is owed under the Agreements, and to comply with its contractual commitments to Sabre.

61. As such, DISH owes Sabre $768,533 for active Purchase Orders.

## V.   DISH IMPROPERLY ATTEMPTED TO TERMINATE THE LOC FOR CONVENIENCE

62. In the October 17 Letter, DISH attempted to terminate the LOC for convenience. This action was not permitted by the LOC, as its terms expressly state that the LOC is "firm, non-cancellable and legally binding."

63. Conversely, the MPA permits DISH to terminate that agreement for convenience, but there is a direct conflict between the LOC and the MPA. Pursuant to the conflict clause in the LOC, the LOC controls.

64. Accordingly, DISH owes Sabre the total committed purchase value under the LOC, in the amount of$2,108,277.

65. The parties' dispute under the MPA, First Amendment to MPA and LOC are ripe and appropriate for resolution by declaratory judgment and money damages. In a letter to DISH dated November 13, 2025, Sabre rejected DISH's assertions that a force majeure had occurred under the MPA and that DISH could terminate the LOC for convenience. Sabre made

clear that DISH remains obligated to perform under the MPA and LOC and that DISH's termination was wrongful. A true and correct copy of this letter is attached as **Exhibit E**.

66. As of the date of this filing, DISH continues to maintain that a force majeure event has occurred and has failed or refused to honor its duties and obligations under the MPA, First Amendment to MPA and LOC.

67. At all times, Sabre has acted in good faith and has honored and performed all of its duties and obligations under the MPA, First Amendment to MPA and LOC.

68. Based on the foregoing, an actual controversy exists between Sabre and DISH regarding the parties' rights and obligations under the MPA, First Amendment to MPA and LOC, whether a force majeure event has in fact occurred under the MPA, whether DISH is permitted to terminate the LOC for convenience, and whether DISH remains obligated to perform its obligations under the MPA, First Amendment to MPA and LOC.

69. Accordingly, Sabre is entitled to a declaration confirming that (a) a force majeure event has not occurred consistent with the MPA; (b) DISH cannot terminate for convenience under the LOC;(c) DISH is not excused from performing its obligations under the MPA, First Amendment to MPA and LOC; (d) both the MPA, First Amendment to MPA and LOC remain in full force and effect; (e) DISH remains obligated to perform all of its obligations under the MPA, First Amendment to MPA and LOC, and; (f) DISH is in breach of the Agreements.

## FIRST CLAIM FOR RELIEF

**(Declaratory Judgment that a Force Majeure Has Not Occurred Under the MPA and that Performance Remains Commercially Practicable)**

70. Sabre incorporates the foregoing allegations by reference.

71. On April 10, 2024, Sabre and DISH entered into the MPA.

72. Under the terms of the MPA, DISH agreed to purchase certain equipment and services from DISH for a set period of time.

73. At this time, DISH owes Sabre $768,533 for active Purchase Orders.

74. On October 17, 2025, DISH purported to notify Sabre that, as a result of the FCC's recent inquiry and the planned closings of the AT&T and SpaceX Transactions, a force majeure even had occurred excusing DISH's performance, and that performance of the MPA was now commercially impracticable

75. DISH's notice of force majeure was and remains baseless under the MPA and unlawful as a matter of law.

76. None of the events described by DISH consitute a force majeure under the MPA.

77. None of the events described by DISH frustrate the purpose of the MPA or make performance of the MPA or LOC commercially impracticable.

78. An actual and substantial controversy exists between the parties regarding their rights and obligations under the MPA and LOC, including whether a force maejure event has occurred under the Agreement, whether DISH's performance under the MPA remains commercially practicable, and whether DISH remains obligated to perform its forthcoming payment obligations under the MPA. This controversy is immediate, real, ongoing, and justiciable.

79. Pursuant to 28 U.S.C. §§ 2201 and 2202, Sabre is entitled to a declaration confirming that no force majeure has occurred that excuses DISH from performing its obligations contained in the MPA, First Amendment to MPA and LOC, and that DISH's performance remains commercially practicable, that DISH is not excused from performing any of its obligations thereunder, and that the Agreements remain in full force and effect.

80. Such declaration would resolve the present controversy.

## SECOND CLAIM FOR RELIEF

**(Declaratory Judgment that DISH Cannot Terminate the LOC for Convenience)**

81. Sabre incorporates the foregoing allegations by reference.

82. On May 1, 2025, Sabre and DISH entered into the LOC.

83. Under the terms of the LOC, the parties reiterated their commitment to supply and purchase certain goods, services and equipment.

84. DISH currently owes Sabre the total committed purchase value under the LOC in the amount of $2,108,277.

85. On October 17, 2025, DISH purported to notify Sabre that, as a result of the FCC's recent inquiry and the planned closings of the AT&T and SpaceX Transactions, they planned to terminate the LOC for convenience.

86. DISH's notice of termination was baseless and unlawful as a matter of law under the LOC.

87. The terms of the LOC made it clear that it was binding and non-cancellable.

88. An actual and substantial controversy exists between the parties regarding their rights and obligations under the LOC, including whether DISH can terminate the the LOC for convenience, and whether DISH remains obligated to perform its forthcoming payment obligations under the LOC. This controversy is immediate, real, ongoing, and justiciable.

89. Pursuant to 28 U.S.C. §§ 2201 and 2202, Sabre is entitled to a declaration confirming that DISH cannot terminate the LOC for convenience, that DISH is not excused from performing any of its obligations thereunder, and that the LOC remains in full force and effect.

90. Such declaration would resolve the present controversy.

### THIRD CLAIM FOR RELIEF

**(Breach of Contract)**

91. Sabre incorporates the foregoing allegations by reference.

92. In the MPA, First Amendment to MPA and LOC, Sabre agreed to manufacture, supply and deliver, and DISH agreed to purchase specified telecommunications equipment for use in DISH's development of a nationwide wireless network.

93. Sabre has fully performed its obligations under the Agreements.

94. However, DISH has breached the Agreements by failing to pay Sabre $768,533 for active Purchase Orders under the MPA, and $2,108,277 for the total committed purchase value under the LOC.

95. In sum, DISH has failed to pay Sabre $2,876,810 for their obligations under the Agreements.

96. DISH's breach has caused Sabre to suffer damages and will continue to suffer damages.

### PRAYER FOR RELIEF

WHEREFORE, Sabre is entitled to a judgment against DISH:

a. Declaring that: (i) no force majeure event has occurred under the MPA as a matter of law; (ii) DISH is not excused from performing its obligations under the MPA, First Amendment to MPA and LOC; (iii) the MPA, First Amendment to MPA and LOC remain in full force and effect; (iv) DISH remains obligated to perform all of its obligations under the MPA, First Amendment to MPA and LOC, and; (v) DISH is in breach of the Agreements.

    b.    Declaring that: (i) DISH cannot cancel the LOC for convenience; (ii) DISH is not excused from performing its obligations under the LOC; (iii) that the LOC remains in full force and effect; and (iv) DISH remains obligated to perform all of its obligations under the LOC;

    c.    Awarding Sabre all costs in this action as well as reasonable attorneys' fees, and;

    d.    Awarding any other relief as the Court deems just and proper.

Respectfully Submitted,

GORDON REES SCULLY
MANSUKHANI, LLP

By: */s/ Peter E. Strniste*

Peter E. Strniste, Jr.
*Attorneys for Plaintiff*
One Battery Park Plaza, 28th Floor
New York, NY 10004
T: 212-453-0730
pstrniste@grsm.com